United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HAROLD HIGGINBOTTOM dba HIGGINBOTTOM FLOOR COVERING, an individual; on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>U.S. BANCORP, a Delaware Corporation; U.S. BANK, N.A.; LYON FINANCIAL SERVICES, INC., a Minnesota Corporation, dba U.S. BANCORP MANIFEST FUNDING SERVICES,<br><br>Defendants. | Case No.: 10-CV-04593-LHK<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |

Plaintiff Harold Higginbottom dba Higginbottom Floor Covering ("Higginbottom") filed a complaint on behalf of himself and all similarly situated individuals against Defendants U.S. Bancorp, U.S. Bank National Association ("U.S. Bank"), and Lyon Financial Services, Inc. dba U.S. Bancorp Manifest Funding Services ("Lyon") for charging him an illegally high interest rate on a small business loan. Dkt. No. 1 ("Compl."). Defendants move to dismiss Higginbottom's complaint. Dkt. No. 18 ("Mot."); *see also* Dkt. No. 27 ("Reply"). Higginbottom opposes. Dkt. No. 18 ("Opp'n").[1] The Court held a hearing on this matter on April 7, 2011. After considering

[1] Higginbottom also filed an administrative motion for leave to file a sur-reply. Dkt. No. 29. Defendants did not oppose. The Court GRANTS Higginbottom's administrative motion and will consider Higginbottom's sur-reply. Dkt. No. 30 ("Sur-Reply").

the parties' submissions, the relevant legal authorities, and parties' arguments at the hearing, the Court hereby GRANTS Defendants' motion to dismiss with leave to amend.

**I. BACKGROUND**

Higginbottom is a sole proprietor based in Morgan Hill, California. Compl. ¶ 8. He alleges that on September 19, 2005, he entered into a lease agreement with Americorp Financial, LLC to finance a trailer for his business. *Id.* ¶ 21. Americorp Financial, LLC then assigned the lease agreement to Defendant Lyon, a Minnesota corporation based in Marshall, Minnesota.[2] *Id.* ¶ 21. Higginbottom claims that the principal amount of his September 19, 2005 lease agreement was $26,100, the purchase price of the trailer. *Id.* ¶ 22. Under the lease agreement, Higginbottom was to make 48 monthly payments of $780.07. *Id.* According to Higginbottom, this meant that he was paying an interest rate of 18.98 percent. *Id.* Higginbottom claims that this interest rate was not disclosed in the lease agreement. *Id.*

Higginbottom further claims that the 18.98 percent interest rate that Lyon charged him pursuant to the lease agreement violates federal and state usury laws. Accordingly, Higginbottom seeks relief against Lyon, U.S. Bank, and U.S. Bancorp for the following: (1) Charging usurious rates of interest in violation of the National Bank Act; (2) Charging usurious interest in violation of Minnesota state law; and (3) Violating California Business and Professions Code § 17200. Although Higginbottom's complaint does not contain specific allegations related to the conduct of U.S. Bank or U.S. Bancorp, Higginbottom's complaint does allege that all Defendants are agents of each other, aided and abetted each other in breaching their obligations to Higginbottom, and each acted as the alter ego of the others. *Id.* ¶¶ 12-14.

**II. LEGAL STANDARD**

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

[2] According to Higginbottom's complaint, Lyon is a wholly owned operating subsidiary of Defendant U.S. Bank. *Id.* ¶ 11. U.S. Bank is a national bank and is a wholly owned subsidiary of Defendant U.S. Bancorp. *Id.* ¶ 10. U.S. Bancorp is a Delaware corporation that Higginbottom alleges is headquartered in Marshall, Minnesota. *Id.* ¶ 9.

555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008) (citation omitted). "A Rule 12(b)(6) dismissal may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121-22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). "[I]n dismissing for failure to state a claim under Rule 12(b)(6), 'a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).

"As a general rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). Two exceptions to this rule exist. *Id.* "First, a court may consider 'material which is properly submitted as part of the complaint' . . . ." *Id.* (citation omitted). "If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is not contested and the plaintiff's complaint necessarily relies on them." *Id.* (quoting *Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir. 1998)) (quotation marks and alterations omitted). "Second, under Fed. R. Evid. 201, a court may take judicial notice of 'matters of public record.'" *Id.* at 688-89 (quoting *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir. 1986)).

## III. ANALYSIS

Higginbottom brings three causes of action in his complaint. Higginbottom's first cause of action arises from Defendants' alleged violation of the National Bank Act, 12 U.S.C. § 1 *et seq.* (the "NBA"). Compl. ¶¶ 33-37. Specifically, Higginbottom claims that Defendants charged him

interest greater than that allowed by 12 U.S.C. § 85.[3] *Id.* ¶ 35. Higginbottom's second cause of action arises from Defendants' alleged violation of Minnesota state usury law. *Id.* ¶¶ 38-42. Finally, Higginbottom's third cause of action arises from Defendants' alleged violation of California's Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.* ("UCL"). *Id.* ¶¶ 43-51. At the hearing, Higginbottom represented that his NBA claim and Minnesota state usury law claim are pled in the alternative. The Court will consider whether Higginbottom has stated a claim under any of these legal theories.

**A. National Banking Act**

Congress enacted the NBA in 1864 to establish "the system of national banking still in place today." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10, 127 S. Ct. 1559, 167 L. Ed. 2d 389 (2007) (citations omitted). The NBA is meant "to protect national banks against intrusive regulation by the States." *Bank of Am. v. City & County of S.F.*, 309 F.3d 551, 561 (9th Cir. 2002) (citation omitted). Under the NBA, national banks have "authority to exercise 'all such incidental powers as shall be necessary to carry on the business of banking.'" *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 554-55 (9th Cir. 2010) (quoting 12 U.S.C. § 24 (Seventh)). "[T]he Office of the Comptroller of the Currency ('OCC') has the primary responsibility for the surveillance of the 'business of banking' authorized by the [NBA]." *Id.* at 555 (quoting *Nationsbank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256, 115 S. Ct. 810, 130 L. Ed. 2d 740 (1995)). "To carry out this responsibility, the OCC has the power to promulgate regulations and to use its rulemaking authority to define the 'incidental powers' of national banks beyond those specifically enumerated in the statute." *Id.* (citations omitted).

Section 85 of the NBA "sets forth the substantive limits on the rates of interest that national banks may charge." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 9, 123 S. Ct. 2058, 156 L. Ed.

[3] The right to relief for violation of 12 U.S.C. § 85 is found in 12 U.S.C. § 86: "The taking, receiving, reserving, or charging a rate of interest greater than is allowed by the preceding section [12 USCS § 85], when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of an action of debt, twice the amount of the interest thus paid from the association taking or receiving the same: provided such action is commenced within two years from the time the usurious transaction occurred."

United States District Court
For the Northern District of California

2d 1 (2003). Pursuant to § 85, national banks "may take, receive, reserve, and charge on any loan . . . interest at the rate allowed by the laws of the State, Territory, or District where the bank is located." 12 U.S.C. § 85.[4] According to the Supreme Court, "[t]he congressional debates surrounding the enactment of" the precursor section to § 85 "were conducted on the assumption that a national bank was 'located' for purposes of the section in the State named in its organization certificate."[5] *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 310, 99 S. Ct. 540, 58 L. Ed. 2d 534 (1978) (citation omitted). In *Marquette*, the Supreme Court held that a national bank, with a charter address in Nebraska, was located in Nebraska even though the bank was extending credit to residents of Minnesota. *Id.* at 309-13. This meant that the bank was allowed to charge Minnesota residents interest rates permitted under Nebraska state law, even if those interest rates were prohibited under Minnesota state law. *Id.*; *see also Smiley v. Citibank (S.D.), N.A*, 517 U.S. 735, 737, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996) (recognizing that the Supreme Court's holding in *Marquette* "authorizes a national bank to charge out-of-state credit-card customers an interest rate allowed by the bank's home State, even when that rate is higher than what is permitted by the States in which the cardholders reside").

---

[4] The full text of § 85 is as follows: "Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this title. When no rate is fixed by the laws of the State, or Territory, or District, the bank may take, receive, reserve, or charge a rate not exceeding 7 per centum, or 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run. The maximum amount of interest or discount to be charged at a branch of an association located outside of the States of the United States and the District of Columbia shall be at the rate allowed by the laws of the county, territory, dependency, province, dominion, insular possession, or other political subdivision where the branch is located. And the purchase, discount, or sale of a bona fide bill of exchange, payable at another place than the place of such purchase, discount, or sale, at not more than the current rate of exchange for sight-drafts in addition to the interest, shall not be considered as taking or receiving a greater rate of interest."

[5] "The National Bank Act requires a national bank to state in its organization certificate 'the place where its operations of discount and deposit are to be carried on, designating the State, Territory, or district, and the particular county and city, town, or village.'" *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 309, 99 S. Ct. 540, 58 L. Ed. 2d 534 (1978) (alterations omitted).

The parties do not dispute that U.S. Bank is a national bank located in Ohio.[6] Thus, U.S. Bank could charge Higginbottom any interest rate allowed by Ohio state law. Americorp Financial, LLC, however, assigned the lease agreement to Lyon, not U.S. Bank. As alleged in Higginbottom's complaint, Lyon is a wholly owned operating subsidiary of U.S. Bank and is headquartered in Marshall, Minnesota. Compl. ¶ 11. The question is then whether the NBA permits a national bank's operating subsidiary to charge any interest rate that is permissible under the law of the national bank's home state or whether the NBA restricts such a subsidiary to charging only interest rates that are permissible under the law of the state where the operating subsidiary is located.

Both parties agree that the NBA, and not state law, governs the actions of a national bank's operating subsidiary. *See Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 7, 127 S. Ct. 1559, 167 L. Ed. 2d 389 (2007) (holding that a national bank's "mortgage business, whether conducted by the bank itself or through the bank's operating subsidiary, is subject to OCC's superintendence, and not to the licensing, reporting, and visitorial regimes of the several States in which the subsidiary operates"). Both parties also agree that the NBA applies to a national bank's operating subsidiary in the same manner that the NBA applies to national banks. *See* 12 C.F.R. § 7.4006 ("Unless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank.").[7] Where the parties disagree is in the way that § 85 of the NBA applies to operating subsidiaries.

[6] Defendants provided the Court copies from the OCC's and the FDIC's websites showing that U.S. Bank's home state and headquarters is in Ohio. *See* Dkt. No. 19 ("Defs.' RJN"), Exs. A, B. Courts can take judicial notice of information provided on government websites. *See e.g.*, *Simon v. Bank of Am., N.A.*, No. 10-cv-00300, 2010 U.S. Dist. LEXIS 63480 (D. Nev. June 23, 2010) (citing cases). Plaintiff did not challenge the accuracy or authenticity of these documents. The Court takes judicial notice of Exhibits A and B from Defendants' Request for Judicial Notice.

[7] As the Ninth Circuit has noted, the NBA is silent regarding operating subsidiaries. *See Wells Fargo Bank N.A. v. Boutris*, 419 F.3d 949, 959 (9th Cir. 2005) (footnote omitted). However, the Ninth Circuit has held that "OCC's interpretation of 12 U.S.C. § 24 (Seventh) as authorizing it to allow national banks to conduct business through operating subsidiaries is a permissible one." *Id.* at 960. Because § 7.4006 is a reasonable construction of the NBA, this Court is to give it "great weight." *See Bank of Am. v. City & County of S.F.*, 309 F.3d 551, 563 (9th Cir. 2002) ("We give 'great weight' to any reasonable construction of a regulatory statute adopted by the agency charged with its enforcement.") (citing *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 403, 107 S. Ct. 750, 93 L. Ed. 2d 757 (1987)).

Defendants argue that § 85 of the NBA should govern a national bank's operating subsidiary's actions as if the parent national bank performed those actions. Reply 4-5. This, Defendants argue, means that if a parent national bank could charge the interest rate in question, then the national bank's operating subsidiary may also charge the same interest rate. Higginbottom, in contrast, argues that § 85 of the NBA applies to an operating subsidiary as if it were itself a national bank. According to Higginbottom, this means that an operating subsidiary may charge customers around the country any interest rate allowed by the state where it is located. Opp'n 11. This, Higginbottom claims, mirrors a national bank's authority to charge customers across the country interest rates permitted by the national bank's home state. *Id.* Higginbottom claims that to hold otherwise would disrupt the competitive equality between national and state banks and would thereby eviscerate the dual-system of banking established by the NBA. *Id.* at 12-13 (citing *First Nat'l Bank in Plant City v. Dickinson*, 396 U.S. 122, 133, 90 S. Ct. 337, 24 L. Ed. 2d 312 (1969); *Watters*, 550 U.S. at 23 (Stevens, J., dissenting)).

Although both positions have merit, the Court finds Defendants' position more persuasive. First, the plain wording of OCC promulgated regulations suggest that an operating subsidiary may perform any activity that its parent national bank may perform. Under 12 C.F.R. § 5.34(e)(1), "[a] national bank may conduct in an operating subsidiary activities that are permissible for a national bank to engage in directly either as part of, or incidental to, the business of banking." In addition, under 12 C.F.R. § 7.4006, "operating subsidiaries are to have the *same* authority as, and be subject to the *same* governmental regulation as, their national banks parents." *Boutris*, 419 F.3d at 962. In other words, "[o]perating subsidiaries are subject to no less *and* no more governmental regulation, state and federal, than national banks." *Id.* Here, neither party disputes that the NBA allows U.S. Bank to charge California residents, such as Higginbottom, any interest rate permitted under Ohio state law. If U.S. Bank may conduct in Lyon any activity that is permissible for it to engage in directly, then Lyon must be allowed to charge California residents interest rates permitted under Ohio state law.

Second, Higginbottom's contrary conclusion is ultimately unpersuasive because, as one court put it, his analysis is "too formalistic" and overly concerned with whom is being regulated

rather that what activity is being regulated. *See SPGGC, LLC v. Ayotte*, 488 F.3d 525, 532 (1st Cir. 2007) (citing *Watters*, 550 U.S. 1, 127 S. Ct. at 1570, 167 L. Ed. 2d at 404). "[I]n analyzing whether state law hampers the federally permitted activities of a national bank," the Supreme Court has "focused on the exercise of a national bank's *powers*, not on its corporate structure." *Watters*, 550 U.S. at 18, 127 S. Ct. 1559, 167 L. Ed. 2d 389 (citation omitted). As a result, the Supreme Court has "treated operating subsidiaries as equivalent to national banks with respect to powers exercised under federal law (except where federal law provides otherwise)." *Id.*; *see also Budnik v. Bank of Am. Mortg.*, No. 03-6116, 2003 U.S. Dist. LEXIS 22542, at *6 (N.D. Ill. Dec. 15, 2003) ("Courts have uniformly treated the activities of an operating subsidiary as being equivalent to the activities of the national bank.") (citation and footnote omitted). The security against significant interference by state regulators "should adhere whether the business is conducted by the bank itself or is assigned to an operating subsidiary." *Id.* at 18-19 (citation omitted).

Here, the activity being regulated is a national bank's taking of usury. What constitutes the taking of usury by a national bank is completely defined by federal law. *See Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 10, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003) (quoting *Evans v. Nat'l Bank of Savannah*, 251 U.S. 108, 114, 40 S. Ct. 58, 64 L. Ed. 171 (1919)); *see also Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 352 (2d Cir. 2008) ("The interest rate that a national bank may charge is . . . governed by federal law.") (quoting *Marquette*, 439 U.S. at 308, 99 S. Ct. 540, 58 L. Ed. 2d 534) (quotation marks and alterations omitted); *Poskin v. TD Banknorth, N.A.*, 687 F. Supp. 2d 530, 560 (W.D. Pa. 2009) ("The NBA specifically governs the interest rate that a national bank may charge."). The reference to state law in defining the taking of usury is done only to determine the maximum permitted rate. *Id.* There is no dispute between the parties that it would have been permissible for U.S. Bank to charge Higginbottom the 18.98 percent interest rate. In other words, there is no dispute that Minnesota state usury law cannot hinder U.S. Bank's power to charge California residents an interest rate permitted by 12 U.S.C. § 85. The fact that U.S. Bank is attempting to charge such an interest rate through an operating subsidiary should not change the result. Minnesota state law should not be allowed to hinder Lyon's engagement in the business of banking any more than it can hinder U.S. Bank's engagement in the business of banking.

Finally, Higginbottom's contention that allowing Lyon to charge the alleged interest rate would eviscerate the dual system of banking is unpersuasive. First, the policies underlying a national bank's right to conduct banking through operating subsidiaries favor allowing operating subsidiaries to perform those activities their parent national banks are authorized to perform. As stated by the Fourth Circuit, "[i]f state law applied to operating subsidiaries to a greater extent than it applied to their parent national banks, it would frustrate national banks' right to conduct the 'business of banking' through operating subsidiaries." *Nat'l City Bank v. Turnbaugh*, 463 F.3d 325, 332 (4th Cir. 2006). Second, when the Second Circuit faced concerns that § 7.4006 would interfere with states' abilities to protect consumers, concerns similar to those raised by Higginbottom in this case, the court directed those concerned with the policy implications of § 7.4006 to seek recourse with Congress. *See Wachovia Bank, N.A. v. Burke*, 414 F.3d 305, 321 (2d Cir. 2005). Although Higginbottom's concerns have merit, this is not the correct forum to resolve those concerns.

Defendants claim, and Plaintiff does not contest, that the 18.98 percent interest on the lease agreement is permitted by Ohio law. Mot. 6 (citing OHIO REV. CODE ANN. § 1343.01). Therefore, Higginbottom's NBA claim fails and is dismissed with leave to amend. Higginbottom may, if possible, amend his complaint to allege facts showing that Defendants charged him an interest rate beyond the maximum allowed under Ohio state law.

**B. State Usury Claim**

Higginbottom's second claim for relief arises from Defendants' alleged violation of Minnesota state law. Compl. ¶¶ 38-42. Higginbottom claims that Defendants violated Minnesota law by charging him an interest rate exceeding those permitted by Minnesota Statutes §§ 48.195 & 334.011. *Id.* Even though Higginbottom concedes that the NBA generally governs the activities of a national bank's operating subsidiaries, he argues that Minnesota state law applies here for two reasons. First, Higginbottom argues that the lease agreement expressly requires the application of Minnesota law. Opp'n 5. Second, Higginbottom argues that Defendants forfeited the right to exercise their powers under federal law because Lyon performed non-ministerial functions. Opp'n 14. Defendants contend that neither of Higginbottom's arguments justifies allowing him to seek

United States District Court
For the Northern District of California

relief under Minnesota law rather than under the NBA provision governing usury claims. Reply 5-10. Defendants also argue that even if this Court applied Minnesota law rather than the NBA, Minnesota law actually allows the interest rate allegedly charged. Reply 10-12.

The Court will consider whether either of Higginbottom's arguments supports the application of Minnesota law. Nevertheless, because the Court finds that Higginbottom must seek relief for Defendants' alleged conduct pursuant to the NBA rather than Minnesota state law, the Court will not consider whether Minnesota law allows the interest rate at issue.

**1. Choice of Law Provision**

As stated in the lease agreement, the agreement is to "be construed, governed, interpreted, and enforced in accordance with the laws of the state of Michigan or the home state of whoever holds the lessor's interest." Dkt. No. 24, Ex. 1.[8] Even if the Court accepts that the choice of law clause contained in the lease agreement is enforceable, "the incorporation of state law does not signify the inapplicability of federal law, for 'a fundamental principle in our system of complex national polity' mandates that 'the Constitution, laws, and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution.'" *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 157, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982) (quoting *Hauenstein v. Lynham*, 100 U.S. 483, 490 (1880)). Thus, the inclusion of a choice of law clause in the lease agreement does not preclude the application of applicable federal law.[9] As discussed

---

[8] Plaintiff requests that this Court consider the lease agreement entered into between the parties. The Court grants Plaintiff's request because the lease agreement's contents were alleged in the Plaintiff's complaint and no party has questioned the authenticity of the lease agreement provided. *See Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1125 (9th Cir. 2002).

[9] At the hearing, Higginbottom argued that footnote 12 of the *de la Cuesta* decision requires a different result in this case. Higginbottom is correct that the deed at issue in *de la Cuesta* provided that the law of the jurisdiction in which the property was located—as opposed to the law of the state—would govern. 458 U.S. at 158 n.12. This difference in wording is not significant enough to persuade the Court that federal law does not apply here. As the Supreme Court noted, choice of law provisions like the one at issue in *de la Cuesta* are not meant to elevate state law over federal law. *See id.* Rather, such choice of law provisions are used when interstate disputes arise regarding the interpretation of the instrument at issue. *See id.* The Court sees no reason why the use of the phrase "laws of the state" should have a different purpose than the phrase "law of the jurisdiction." As such, the principle enunciated in *de la Cuesta* should apply here with equal force. There is no dispute in this case as to the correct interpretation of the lease agreement. Instead, Higginbottom seeks to use the choice of law provision to elevate state law over federal law. This, according to the Supreme Court in *de la Cuesta*, is not the purpose of the lease agreement's choice

United States District Court
For the Northern District of California

above, federal law determines the interest rate that operating subsidiaries of national banks can charge. In this case, federal law allows Lyon to charge interest rates that comply with Ohio law.

**2. Forfeiture**

Higginbottom argues that Defendants forfeited the right to exercise their powers under federal law because Lyon performed non-ministerial functions. Opp'n 14. The case on which Higginbottom relies for this proposition, however, is inapplicable here. In *Citibank (SD) N.A. v. Hansen*, 28 Misc. 3d 195, 902 N.Y.S.2d 299 (Dist. Ct. Nassau Co. April 23, 2010), the court dealt with a federal bank with a home office in one state and a branch office in another state. Here, Higginbottom has not alleged that U.S. Bank has any branch offices in Minnesota. Rather, Higginbottom's complaint alleges that Lyon is an operating subsidiary of U.S. Bank. At the hearing, Higginbottom conceded that operating subsidiaries and branch offices are different entities. Because Lyon is an operating subsidiary and not a branch, the test applied in *Citibank (SD) N.A. v. Hansen* does not determine the outcome here.

**3. Preemption**

The Court's decision to require Higginbottom to seek relief pursuant to the NBA rather than Minnesota law is consistent with the general principle that the NBA preempts all state law usury claims. "In actions against national banks for usury, [sections 85 and 86] supersede both the substantive and the remedial provisions of state usury laws and create a federal remedy for overcharges that is exclusive, even when a state complainant . . . relies entirely on state law." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11, 123 S. Ct. 2058, 156 L. Ed. 2d 1 (2003). "Because §§ 85 and 86 provide the exclusive cause of action for such claims, there is, in short, no such thing as a state-law claim of usury against a national bank." *Id.* This applies to the operating subsidiaries of national banks as well. *See Watters*, 550 U.S. at 18, 127 S. Ct. 1559, 167 L. Ed. 2d 389 ("We have never held that the preemptive reach of the NBA extends only to a national bank itself. Rather, . . . we have treated operating subsidiaries as equivalent to national banks with respect to powers exercised under federal law . . . .") (citation omitted); *see also Jefferson v. Chase*

---

of law provision. Thus, despite the presence of the choice of law provision in the lease agreement, the NBA still applies.

*Home Fin.*, No. C 06-6510, 2008 U.S. Dist. LEXIS 101031, at *23 n.3 (N.D. Cal. Apr. 29, 2008) ("The preemptive reach of the NBA also extends to 'operating subsidiaries' of national banks . . . .") (citation omitted).

Because Lyon neither contracted away nor forfeited its right to have the NBA, and not Minnesota state law, govern what interest rate it may charge, Higginbottom's Minnesota state law claim fails and is dismissed with leave to amend.

**C. UCL Claim**

Higginbottom's final cause of action arises under the UCL. Compl. ¶¶ 43-51. "The UCL prohibits unfair competition, which it broadly defines as including 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) (quoting CAL. BUS. & PROF. CODE § 17200). "Each prong of the UCL is a separate and distinct theory of liability . . . ." *Id.* (citing *South Bay Chevrolet v. General Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 85 Cal. Rptr. 2d 301, 316 (1999)).

Defendants argue that Higginbottom's UCL claim should be dismissed for two reasons. First, Defendants argue that Higginbottom has not stated a proper legal basis for his UCL claim. Mot. 9-10. Second, Defendants argue that the NBA preempts Higginbottom's UCL claim. *Id.* 12-13. Higginbottom contends that he properly states a claim under both the unlawful and unfair prongs of the UCL. Opp'n

First, Higginbottom argues that he states a claim under the unlawful prong of the UCL because Lyon's conduct violates the NBA and Minnesota law. Opp'n 21. As stated above, Lyon's conduct, based on the allegations contained in the complaint, complied with the NBA because Lyon charged an interest rate allowed by Ohio state law. Thus, a violation of the NBA cannot serve as a basis for a violation of the UCL. Higginbottom's reliance on Minnesota law as a basis for his UCL claim also fails because it is preempted by federal law. In determining whether state law claims are preempted by federal law, "the proper inquiry is whether the 'legal duty that is the predicate of' Plaintiffs' state law claim falls within the preemptive power of the NBA or regulations promulgated thereunder." *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1038 (9th


Cir. 2008) (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 524, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992)). Here, the legal duty that is the predicate of Higginbottom's state law claim is the duty to charge interest rates in compliance with Minnesota state usury laws. This duty falls within the preemptive power of the NBA. *See Beneficial Nat'l Bank*, 539 U.S. at 11, 123 S. Ct. 2058, 156 L. Ed. 2d 1 ("Because §§ 85 and 86 provide the exclusive cause of action for [usury] claims, there is, in short, no such thing as a state-law claim of usury against a national bank."). Because Higginbottom has not stated a claim that Defendants violated the NBA, and because any claim based on a violation of Minnesota state usury laws is preempted by the NBA, Higginbottom has not stated a claim under the unlawful prong of the UCL.

Second, Higginbottom argues that he states a claim under the unfair prong because Defendants' conduct goes against California's and Minnesota's announced legislative policies against the charging of usurious interest. Opp'n 21. Higginbottom's UCL claim based on the unfair prong fails because it is also preempted by the NBA. As with his claim under the unlawful prong, the central basis for Higginbottom's unfair prong is Defendants' alleged charging of usurious interest rates. A national bank's operating subsidiary's authority to charge interest is governed by federal law, in particular the NBA. *See Pac. Capital Bank*, 542 F.3d at 352 ("The interest rate that a national bank may charge is . . . governed by federal law.") (quoting *Marquette*, 439 U.S. at 308, 99 S. Ct. 540, 58 L. Ed. 2d 534) (quotation marks and alterations omitted). Any part of Higginbottom's UCL claim that is based on Defendants' charging of interest is preempted by the NBA and the regulations promulgated thereunder. *See Beneficial Nat'l Bank*, 539 U.S. at 11, 123 S. Ct. 2058, 156 L. Ed. 2d 1.

Higginbottom also claims that Defendants' act of hiding the amount of interest charged and making misrepresentations about the legality of the interest rates charged constitutes an unfair and fraudulent business practice. Compl. ¶ 48. Higginbottom's claim that Defendants made misrepresentations about the legality of the interest rates charged does not serve as a proper basis for Higginbottom's UCL claim because, as shown above, Higginbottom has not stated a claim that Defendants charged him an illegal interest rate. If Defendants did not charge Higginbottom an illegal interest rate, then Higginbottom cannot state a claim that Defendants misrepresented the

United States District Court
For the Northern District of California

legality of the interest rate charged. Higginbottom's claim that Defendants hid the amount of interest charged presents a more plausible basis for his UCL claim, but fails to serve as a proper basis for two reasons. First, Higginbottom alleges in his complaint that Americorp Financial, LLC, not Lyon, entered into the lease agreement with him. *Id.* ¶ 21. Lyon's role in allegedly hiding the interest rate from Higginbottom is not articulated in the complaint. Second, the cases cited by Higginbottom involve an alleged violation of federal regulations or state law. *See e.g.*, *Smith v. Wells Fargo Bank, N.A.*, 135 Cal. App. 4th 1463, 38 Cal. Rptr. 3d 653 (2005) (finding UCL claim not preempted where UCL claim was based on failure to disclose in violation of a specific OCC regulation). Here, Higginbottom has not alleged that Defendants' alleged failure to disclose the interest rate violates any federal or state law. Despite these issues, Higginbottom may be able to amend his complaint to properly state a UCL cause of action based on Defendants' alleged hiding of the amount of interest charged. Accordingly, the Court dismisses Higginbottom's UCL claim with leave to amend.[10]

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion. All three of Higginbottom's causes of action are dismissed with leave to amend. Higginbottom shall file an amended complaint, if any, within thirty (30) days of this Order to correct the deficiencies discussed in this Order.

**IT IS SO ORDERED.**

Dated: April 25, 2011

LUCY H. KOH
United States District Judge

[10] Because none of Higginbottom's claims against Lyon survive Defendants' motion, the Court need not consider Higginbottom's claims for agency, joint venture, conspiracy and alter ego against U.S. Bank and U.S. Bancorp.